IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI
NO. 2017-CA-00104-COA

**PAUL POSEY AND ROBERT POSEY**                                    **APPELLANTS**

**v.**

**DOROTHY POPE AND WILLARD POSEY**                          **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/06/2016 |
| TRIAL JUDGE: | HON. EDWARD C. FENWICK |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | STEVEN DETROY SETTLEMIRES |
| ATTORNEYS FOR APPELLEES: | G. TODD BURWELL |
| | EMILY KINCSES LINDSAY |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED: 08/28/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

> **BEFORE GRIFFIS, P.J., FAIR AND TINDELL, JJ.**
>
> **TINDELL, J., FOR THE COURT:**

¶1.    This appeal arises from a dispute among siblings Paul Posey and Robert Posey (collectively, the Proponents) and Dorothy Pope and Willard Posey (collectively, the Contestants) as to the validity of a 2008 will (the 2008 will) executed by their mother, Gladys Posey. Following Gladys's death in 2013, Paul submitted the 2008 will to probate and recorded three warranty deeds (the 2013 deeds)[1] that transferred portions of Gladys's real property to the Proponents' children and grandchildren. The Contestants subsequently filed

---

[1] Although Paul executed two of the deeds in 2012, he waited until 2013 to record all three deeds. As a result, we collectively refer to these three warranty deeds as the 2013 deeds.

a complaint in Neshoba County Chancery Court and alleged the Proponents procured both the 2008 will and the 2013 deeds through undue influence. In a bifurcated trial solely on the issue of the 2008 will's validity, a Neshoba County jury returned a verdict in favor of the Contestants. Citing Mississippi Rule of Civil Procedure 54(b), the Neshoba County Chancery Court entered a final judgment that revoked Gladys's 2008 will.

¶2. The Proponents appeal both the chancellor's final judgment and his denial of their motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. On appeal, the Proponents raise the following arguments: (1) the chancellor's evidentiary rulings on the parties' motion-in-limine requests resulted in the admission of evidence that was unfairly prejudicial, confused the issues, and misled the jury; (2) the chancellor erroneously gave jury instructions that were too numerous and that misled and confused the jury; and (3) insufficient evidence supported the jury's verdict that the Proponents procured the 2008 will through undue influence.

¶3. Finding no error, we affirm.

**FACTS**

**I. The 2007 Deeds and the 2008 Complaint**

¶4. In 1996, Madison Posey executed a will that left all his real property to his wife, Gladys. If Gladys predeceased Madison, his will directed that his real property be equally divided among five of the couple's six children, including the Proponents and the Contestants. Gladys's will mirrored the provisions of Madison's will.

¶5. In 2004, Madison died and left Gladys approximately 138 acres of land in Neshoba

2

County, Mississippi. At the time of Madison's death, Gladys was in her mid-eighties. Through two separate warranty deeds signed on September 13, 2007 (the 2007 deeds), Gladys conveyed approximately 132 acres of her property to the Proponents. On April 10, 2008, she executed a general durable power of attorney that appointed her son Paul her attorney-in-fact.

¶6. On June 30, 2008, the Contestants filed a complaint (the 2008 action) to cancel the 2007 deeds based on undue influence and to confirm their title to part of the conveyed land through adverse possession. In a January 30, 2012 final judgment, the chancellor found the Contestants had sufficiently proven their claims of undue influence and adverse possession. As a result, the chancellor set aside the property conveyed to the Proponents through the two 2007 deeds and granted the Contestants' claims of title by adverse possession. On appeal, this Court found the Proponents lacked standing to appeal the chancellor's judgment. *Posey v. Pope*, 130 So. 3d 1183, 1185 (¶5) (Miss. Ct. App. 2014). We therefore dismissed the appeal. *Id.*

**II.     The 2008 Will, the 2013 Warranty Deeds, and the 2013 Action**

¶7. Gladys died on May 21, 2013.[2] The same day, Paul recorded the three 2013 deeds, which conveyed portions of Gladys's real property to only the Proponents' children and grandchildren.[3] Several days later, on June 6, 2013, Paul filed a petition to open Gladys's

---

[2] The record contains contradictory evidence as to the date of Gladys's death. However, because the letters testamentary identify May 21, 2013, as the day Gladys died, we use that date throughout our opinion.

[3] Acting as Gladys's attorney-in-fact, Paul had previously executed two of the deeds on September 10, 2012, and the third on January 9, 2013.

estate and for the issuance of letters testamentary. Paul submitted for probate the 2008 will, which considerably changed the distribution of Gladys's property to favor the Proponents. While Gladys's 1996 will had evenly distributed her property among the Proponents, the Contestants, and one other sibling, her 2008 will bequeathed four of her children, including the Contestants, only $100 each and devised and bequeathed the remainder of her estate to the Proponents.

¶8. On June 12, 2013, the chancellor entered an order to admit the 2008 will to probate. The chancellor also appointed Paul executor of Gladys's estate and issued letters testamentary. In August 2013, the Contestants filed a complaint (the 2013 action) to set aside the 2008 will and the property conveyed through the three 2013 deeds. The Contestants also filed a successful motion to remove Paul as executor of Gladys's estate and to consolidate their complaint with the estate proceedings.

¶9. Prior to trial, the Proponents filed two motions in limine in which they sought to (1) prohibit any mention to the jury of the undue-influence judgment related to the 2007 deeds; and (2) bifurcate the trial to first determine the validity of the 2008 will. The Contestants likewise filed a motion in limine that sought to restrict the trial to the issue of the 2008 will's validity. The Contestants' motion in limine also sought the exclusion of the following: (1) any mention of or testimony about "the [w]ill executed by Madison; the adverse possession of the real property at issue in the 2008 [action]; and[] how any of the property, whether real or personal, in . . . Gladys['s estate] should be distributed"; (2) any testimony offered by the Proponents to rebut a presumption of undue influence; (3) any hearsay regarding Gladys's

4

opinion of the Contestants and how Gladys wished to dispose of her assets; and (4) any hearsay regarding statements Dorothy allegedly made to third-party entities about Gladys and Paul. Along with their motion in limine, the Contestants filed a motion to bifurcate the trial so that the jury only received facts and evidence related to the 2008 will's validity.

¶10. Following a March 17, 2016 hearing, the chancellor granted the parties' requests to bifurcate the trial. The chancellor therefore restricted the trial to the sole issue of the will contest and reserved all other issues for a later determination. As to the parties' motion-in-limine requests, the chancellor found the Proponents could provide testimony to rebut any presumption of undue influence. However, the chancellor excluded testimony of alleged statements Dorothy made to third-party entities about Gladys and the Proponents as irrelevant, speculative, and hearsay. With regard to evidence about the undue-influence and adverse-possession rulings in the 2008 action and any statements Gladys made about her opinion of the Contestants or how she wished her property to be distributed, the chancellor reserved his decision "until trial or such other time that [he] deem[ed] appropriate." In a subsequent order, however, the chancellor determined that the parties' prior litigation, and the resulting findings of undue influence and adverse possession, "would be unfairly prejudicial should the jury hear about the same and [should therefore] be excluded from the will contest[] unless the party attempting to exclude the evidence . . . open[ed] the door by introducing evidence that such party [had attempted] to exclude." The chancellor explained, though, that his ruling did not prohibit the parties from offering evidence presented in the prior litigation about the two 2007 deeds.

5

¶11. Over the course of a three-day trial in September 2016, the parties presented evidence and testimony about the validity of Gladys's 2008 will and whether the Proponents had used undue influence to procure the will. At the close of the Contestants' case-in-chief, the Proponents moved for a directed verdict and argued the Contestants had failed to establish a presumption of undue influence. In denying the motion, the chancellor concluded the Contestants had proven the existence of a confidential relationship between Gladys and the Proponents. The chancellor also found that a triable jury question existed as to whether the Proponents had abused their relationship with Gladys by either asserting dominance over her or by substituting their intent for hers.

¶12. After considering all the parties' evidence, the jury returned a verdict in favor of the Contestants. On October 6, 2016, the chancellor entered a final judgment pursuant to Rule 54(b) that revoked Gladys's 2008 will. The Proponents filed an unsuccessful motion for a JNOV or, in the alternative, a new trial. Aggrieved by the chancellor's final judgment and his denial of their posttrial motion, the Proponents timely appeal.[4]

## DISCUSSION

### I. Evidentiary Rulings

¶13. The Proponents argue the chancellor's rulings on the parties' motion-in-limine requests resulted in the admission of evidence that was irrelevant, unfairly prejudicial, and confusing to the jury. In particular, the Proponents challenge the chancellor's decision to admit into evidence the 2007 deeds, Gladys's bank records, and the 2013 deeds.

---

[4] As needed, we will relate any additional facts during our discussion of the issues the Proponents raise on appeal.

¶14. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." M.R.E. 401. Unless the United States Constitution, the Mississippi Constitution, or the Mississippi evidentiary rules provide otherwise, relevant evidence is admissible. M.R.E. 402. However, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403. We review the trial court's admission or exclusion of evidence for abuse of discretion. *Ehrhardt v. Donelson*, 221 So. 3d 393, 396 (¶15) (Miss. Ct. App. 2017). "Where error involves the admission or exclusion of evidence, [the appellate courts] will not reverse unless the error adversely affects a substantial right of a party." *Magers v. Diamondhead Resort LLC*, 224 So. 3d 106, 112 (¶11) (Miss. Ct. App. 2016) (quoting *Whitten v. Cox*, 799 So. 2d 1, 13 (¶27) (Miss. 2000)).

### a. The 2007 Deeds

¶15. In one of their motions in limine, the Proponents specifically asked the chancellor to prohibit any mention to the jury about the facts and matters related to the 2008 action. In ruling on the parties' various motion-in-limine requests, the chancellor determined that the 2008 action and the resulting undue-influence and adverse-possession rulings should be excluded from the present will contest. However, the chancellor explained his decision did not prohibit the parties "from offering facts that were presented in the prior litigation concerning the deeds that were at issue . . . ."

7

¶16. Based on the chancellor's ruling, the Contestants sought to admit into evidence the two 2007 deeds that conveyed part of Gladys's property to the Proponents. The Proponents objected to the admission of the 2007 deed conveying land to Paul on the ground of relevance. They asserted no other objection to the exhibit's admission, and they raised no objection at all to the admission of the 2007 deed conveying land to Robert. In overruling the Proponents' objection, the chancellor found the deed was admissible "to establish a pattern" of conduct between Paul and Gladys. On appeal, the Proponents acknowledge the 2007 deeds may have been potentially relevant to the will contest. However, they still assert their admission was unfairly prejudicial, confused the issues, and misled the jury.

¶17. Upon review, we agree with the chancellor that the 2007 deeds were probative to the question of the 2008 will's validity. The Contestants sought to prove that the Proponents had a confidential relationship with Gladys and that suspicious circumstances surrounded the 2008 will's preparation and execution. Like the chancellor, we find the 2007 deeds provided relevant evidence regarding the pattern of conduct that existed between the Proponents and Gladys in the period leading up to the 2008 will's preparation and execution. Despite the Proponents' assertions on appeal, we cannot find that any unfair prejudice or tendency to confuse the issues or mislead the jury substantially outweighed the 2007 deeds' probative value. *See* M.R.E. 403. We therefore find no abuse of discretion in the chancellor's decision to admit the 2007 deeds.

### b. Gladys's Bank Records

¶18. The chancellor also allowed the Contestants to introduce into evidence the bank

8

records from a joint checking account Gladys shared with Paul. The Proponents objected that the bank records bore no relevance to the issue of the 2008 will's validity. On appeal, the Proponents argue that the chancellor's admission of the bank records "inject[ed] collateral issues, to be decided at a later date, into the will contest[,]" unfairly prejudiced them, and resulted in a verdict of passion.

¶19. Upon review, we find the disputed bank records were relevant to support the Contestants' claim that a confidential relationship existed between Gladys and the Proponents until the date of her death. Whether a person maintains a joint account with another is a factor to consider in determining the existence of a confidential relationship. *Kimbrough v. Estate of Kimbrough*, 134 So. 3d 281, 284-85 (¶12) (Miss. 2014). Thus, the bank records were clearly probative to show whether such a relationship existed between Gladys and the Proponents. Furthermore, the bank records established who wrote which checks from the joint account, such as the check Paul filled out for the payment of the 2008 will's preparation. In addition, the bank records showed to what extent the Proponents had access to and control over Gladys's finances. Because we find the bank records' probative value substantially outweighed any danger of unfair prejudice or tendency to confuse the issues or mislead the jury, we find no abuse of discretion in the chancellor's admission of the records. Accordingly, we find this argument lacks merit.

###   c.   The 2013 Deeds

¶20. Finally, the Proponents contend the chancellor abused his discretion by admitting into evidence the 2013 deeds. The Proponents argue the 2013 deeds lacked relevance to the will

9

contest because Paul executed them four years after the 2008 will. Furthermore, the Proponents assert the 2013 deeds' probative value was substantially outweighed by the danger of unfair prejudice and a tendency to confuse the issues and mislead the jury.

¶21. At trial, Paul testified he really only used his mother's power of attorney when she had to "go to the hospital or something, [and] I had to sign for her . . . ." Paul further testified about the instructions Gladys gave him on the division of certain real property among her grandchildren. According to Paul, he always followed his mother's instructions for the disposition of her property.

¶22. On cross-examination, the Contestants sought to impeach Paul's credibility by introducing into evidence the 2013 deeds. Paul executed the 2013 deeds pursuant to the power of attorney. In addition, the 2013 deeds conveyed part of Gladys's property to only the Proponents' children and grandchildren rather than to all of Gladys's grandchildren and great-grandchildren. Overruling the Proponents' objection to the 2013 deeds' relevance, the chancellor allowed the Contestants to admit the 2013 deeds for the limited purpose of impeaching Paul's credibility.

¶23. After considering the evidence, we find no abuse of discretion in the chancellor's decision to admit the 2013 deeds. As discussed, the Contestants only sought to admit the 2013 deeds to impeach Paul's direct-examination testimony. Since the chancellor allowed the 2013 deeds for that limited purpose, their admission did not inject collateral issues into the will contest. The parties presented no arguments regarding the validity of the 2013 deeds, and thus, the sole issue before the jury remained the validity of Gladys's 2008 will.

10

Furthermore, on redirect examination, Paul had an opportunity to explain his actions in executing the 2013 deeds pursuant to the power of attorney. For these reasons, we find this assignment of error lacks merit.

## II. Jury Instructions

¶24. The Proponents next argue the chancellor erred by giving too many jury instructions, which they claim confused and misled the jury. According to the Proponents, the chancellor should have followed Uniform Rule of Circuit and County Court 3.07 and limited each party to the submission of only six jury instructions.[5] As support for their contention that the overall number of instructions confused the jury, the Proponents point to a written question the jury submitted to the chancellor during its deliberations.

¶25. We review a trial court's decision to give or refuse jury instructions for abuse of discretion. *Magers*, 224 So. 3d at 109 (¶6). "When jury instructions are challenged on appeal, we do not review them in isolation: rather, we read them as a whole to determine if the jury was properly instructed." *Id.* at 109-10 (¶6) (internal quotation marks omitted). Where the jury instructions as a whole fairly announce the relevant caselaw and create no injustice, we will find no reversible error. *Id.* at 110 (¶6).

_____

[5] In relevant part, Rule 3.07 states:

At the conclusion of testimony, the attorneys must select no more than six jury instructions on the substantive law of the case from the instructions prefiled and present them to the judge. The court, for good cause shown, may allow more than six instructions on the substantive law of the case to be presented.

URCCC 3.07.

11

¶26. At the beginning of the jury-instruction conference, the Proponents objected that the fourteen instructions the Contestants submitted were too numerous and would confuse the jury. In response, the Contestants explained that, since the chancellor did not usually instruct a jury, they submitted a number of basic court instructions. The Contestants further argued that, since the litigation was complex "in terms of the shifting of burden of proof[,]" good cause existed for the submission of more than six jury instructions. After considering the parties' arguments, the chancellor decided not to limit the number of jury instructions the parties could submit. The chancellor further provided, though, that he would determine whether to actually give each instruction as it was discussed.

¶27. During the jury's deliberations after the trial, the chancellor received a note from the jury that stated as follows: "Explain Question #3 more. Acted independently and without undue influence when she executed her will? The process before or the actual signing." After discussing the jury's note, the chancellor and the parties' attorneys concluded the question referred to jury instruction C-15, which contained four questions the jury had to answer either affirmatively or negatively. The third question contained in instruction C-15 asked: "Do you find, by a preponderance of the evidence, that Gladys Posey acted independently and without undue influence when she executed her will?" Without objection from either party, the chancellor responded to the jury by writing that the answer to their question was set out in instruction C-8. Following the chancellor's response, the jury continued its deliberations and then returned a verdict without asking for further guidance.

¶28. The Mississippi Supreme Court has explained "that the number of instructions

12

submitted to the court and the jury 'lies within the sound judicial discretion of the trial judge[,] who may limit or expand for good cause shown.'" *Blue v. State*, 716 So. 2d 567, 573 (¶25) (Miss. 1998) (quoting *Young v. State*, 451 So. 2d 208, 211 (Miss. 1984)). The supreme court has further held that the six-instruction limit acts as a "numerical beginning point" rather than an "inflexible rule[.]" *Id.* In the present case, we find no abuse of discretion in the chancellor's decision to allow the Contestants to submit more than six jury instructions. In addition, we find no abuse of discretion in the chancellor's decision to give more than six of the Contestants' submitted instructions. While the Proponents renew their trial objection as to the number of jury instructions given, they neither discuss which specific jury instructions may have confused or misled the jury, nor do they argue that any of the Contestants' instructions provided an incorrect statement of law. Furthermore, the Proponents assert no claim that the chancellor incorrectly responded to the jury's question during its deliberations. Thus, after reading the given jury instructions as a whole, we find they fairly announced the applicable caselaw and created no injustice. *See Magers*, 224 So. 3d at 109-10 (¶6). We therefore find this assignment of error lacks merit.

### III. Sufficiency of the Evidence

¶29. In both their motion for a directed verdict at the end of the Contestants' case-in-chief, and again in their posttrial motion for a JNOV, the Proponents challenged the sufficiency of the evidence supporting the finding of undue influence. When reviewing the sufficiency of the evidence, we consider "the trial court's ruling at the last time the sufficiency of the evidence was challenged." *Warren v. State*, 187 So. 3d 616, 627 (¶29) (Miss. 2016) (quoting

13

*Wales v. State*, 73 So. 3d 1113, 1120 (¶19) (Miss. 2011)). We therefore review the chancellor's denial of the Proponents' motion for a JNOV. In so doing, we "view[] the evidence in the light most favorable to the [nonmoving party], and if substantial evidence supports the verdict, we will affirm the judgment of the trial court." *Cope v. Thrasher Constr. Inc.*, 231 So. 3d 989, 993 (¶5) (Miss. 2017) (citing *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 948 (¶25) (Miss. 2008)); *accord Hall v. State*, 245 So. 3d 396, 401 (¶21) (Miss. 2018).

¶30. The Proponents admit that sufficient evidence existed to demonstrate a confidential relationship between Paul and Gladys. However, they also correctly assert this fact alone fails to give rise to a presumption of undue influence. *See Estate of Phelps v. Phelps*, 180 So. 3d 835, 840 (¶23) (Miss. Ct. App. 2015). "A presumption of undue influence arises where: (1) a confidential relationship existed between the testator and a beneficiary, and (2) there existed suspicious circumstances—such as the testator's mental infirmity—or the beneficiary in the confidential relationship was actively involved in some way with preparing or executing the will." *Id.* Here, the Proponents contend the Contestants presented insufficient evidence to prove the second prong of the undue-influence analysis.

¶31. In denying the Proponents' motion for a JNOV, the chancellor found the Contestants presented sufficient evidence for the jury to determine whether the Proponents were actively involved in the 2008 will's preparation or execution or whether suspicious circumstances existed that negated any independent action by Gladys. During the trial, the Contestants established that Gladys and her husband, Madison, had used Mont Mars for their legal

14

matters, including the preparation of their wills in 1996. While Gladys also used Mars to prepare the 2007 deeds, she did not use him a year later to prepare her 2008 will. Instead, Gladys hired Wade White, who had not previously done any legal work for her. White testified that he had known Gladys his entire life. He stated he was related to Willard's wife and was related by marriage to Paul's son, Eddie Posey, and to Eddie's wife. In addition, White testified that, in his capacity as the attorney for the Neshoba County Board of Supervisors, he worked closely with Eddie, who was the county road manager.

¶32. At the time Gladys signed the 2008 will, Paul was her primary caretaker. Gladys was 89 years old, and two of her daughters, Clara Benson and Elaine Powell, testified that cataracts had caused their mother's eyesight to greatly deteriorate. Although White testified that Gladys herself called him to discuss the preparation of her 2008 will, Clara disputed whether her mother could have looked up the number in the phone book. According to Clara, Gladys's eyesight had become so poor that Gladys had difficulty reading or even seeing a glass of water in front of her. Clara further testified that Gladys needed help dialing phone numbers and would ask Clara to dial the numbers for her.

¶33. White testified he could not tell whether Gladys was by herself when the two initially discussed the preparation of the 2008 will because they spoke over the phone. After their telephone conversation, White prepared the 2008 will and took it to Gladys's house for her to review and sign. White testified that Gladys remained seated in a recliner during the visit and that Paul's son, Jeffrey Posey, had to let White and his secretary into the house.[6]

---

[6] White testified he could not remember if Jeffrey was already present to let him into Gladys's house or if someone had to call Jeffrey and ask him to let White into the house.

15

¶34.    Unlike Gladys's prior will, the 2008 will left her entire estate to the Proponents with the exception of a $100 bequest to Clara, Elaine, and each of the Contestants. White testified that he did not recommend to Gladys that she distribute her property that way. White further testified that Gladys did not pay him during his visit to her house. Instead, White later received a check from the joint banking account Gladys shared with Paul. The check was dated the same day that Gladys executed the 2008 will. Paul testified that he went to his mother's house the day she signed the will. Upon arriving, Paul stated that he learned about the 2008 will for the first time and that his mother gave him a check to pay White. Paul testified that his mother was capable of filling out checks herself but that she only signed the check for White. As a result, Paul stated that he dated and filled out the check and then delivered it to White's office.

¶35.    Based upon the evidence the Contestants presented during their case-in-chief, the jurors could have reasonably found the Proponents participated in the 2008 will's preparation or execution or that suspicious circumstances existed that negated any independent action by Gladys. As a result, the jury could have found sufficient information to support a presumption of undue influence. Once the presumption of undue influence arose, the burden shifted to the Proponents—the will beneficiaries—to prove the following: "(1) [g]ood faith on the part of the beneficiar[ies]; (2) the testator's full knowledge and deliberation of [her]

---

Jeffrey testified he thought he arrived at Gladys's house at the same time as White, let White into the house, and then waited outside while White spoke to Gladys. Jeffrey testified that, at the time, his grandmother had an ulcer on her leg that required daily redressing. Because of his healthcare background, Jeffrey testified that he checked on his grandmother each day and helped her redress the wound.

actions and their consequences; and (3) independent consent and action on the part of the testator." *Estate of Phelps*, 180 So. 3d at 841 (¶31). The Proponents were required to prove each of these factors by clear and convincing evidence. *See id.*

### a. Good Faith

¶36. To determine the Proponents' good faith, we consider the following: "(a) the identity of the initiating party seeking preparation of the will; (b) the place of the execution of the will and in whose presence; (c) the fee paid; (d) by whom it was paid; and (e) the secrecy or openness surrounding the execution of the will." *Id.* at (¶32).

¶37. As discussed, Gladys and her husband had traditionally used Mars for all their legal matters. Even for the 2007 deeds, Gladys used Mars. However, for the preparation of her will just a year later, Gladys hired White, who was related to Paul's son and daughter-in-law by marriage and worked closely with Paul's son. Due to their mother's deteriorating eyesight, Clara and Elaine disputed whether Gladys had the ability to locate and dial an unknown telephone number without assistance. Nevertheless, White testified that Gladys initiated the will's preparation herself and that he spoke to no other family members about the document. White stated, though, that he only spoke to Gladys over the phone about the will's preparation. As a result, White could not confirm that Gladys was actually alone when she called.

¶38. Even though Paul testified he knew nothing of the will beforehand, he admitted that he arrived at Gladys's home the same day she executed the new will. Although Gladys was still able to write her own checks, Paul testified that his mother only signed the check for the

payment of the will's preparation. Paul stated that he actually filled out the check from the joint account he shared with his mother and then personally delivered the payment to White's office. According to Paul, he also placed the 2008 will in his personal safety deposit box and never told the Contestants about the document. Paul further testified that, although he mentioned the 2008 will's existence to Clara and Elaine, he never related to them the contents. Based on such testimony, the jury could have concluded the Proponents failed to prove by clear and convincing evidence that they acted in good faith.

### b.    Knowledge and Deliberation

¶39.    We next consider the following factors to determine whether Gladys had full knowledge and deliberation of her actions and their consequences:

> (a) whether [Gladys] was aware of her total assets and their worth; (b) whether [Gladys] understood who her natural inheritors were and how her action would legally affect prior wills; (c) whether [Gladys] knew nonrelative beneficiaries would be included or excluded; and (d) whether [Gladys] knew who controlled her finances and how dependent [Gladys] was on anyone handling her finances.

*Estate of Phelps*, 180 So. 3d at 841 (¶33).

¶40.    The Contestants and Clara testified that Gladys was not aware of the value of her assets. Based on White's limited conversations with Gladys, he also could not testify that Gladys knew her total assets and their worth. According to White, he and Gladys never discussed the details of her estate. Instead, Gladys simply instructed him to prepare a will that left Clara, Elaine, and each of the Contestants $100 and the Proponents the remainder of her estate.

¶41.    The record reflects no dispute that Gladys had full knowledge of her natural inheritors.

18

However, while the Proponents assert that Gladys had good reason to be upset with several of her children and to change the amount they inherited under the 2008 will, they offered no testimony to show by clear and convincing evidence that Gladys understood how her actions would legally affect her prior will.

¶42. As for the final factor, the Proponents acknowledge in their appellate brief that Paul helped Gladys with her finances because Gladys "was virtually physically unable to pay bills and such." In June 2007, Gladys was hospitalized for several weeks. On the day Gladys was discharged, Paul drove her to the bank so she could add him as a joint account owner. The following year, in April 2008, Gladys executed a power of attorney that appointed Paul as her attorney-in-fact. Paul testified that he often wrote checks from the joint account. While Gladys sometimes filled out checks, Paul testified there were many other times when he filled out the checks and his mother simply signed them. Based on the testimony and evidence, the jury could have found the Proponents failed to prove by clear and convincing evidence that Gladys had full knowledge of who controlled her finances.

### c. Independent Consent and Action

¶43. One way for the Proponents to prove Gladys exhibited independent consent and action was to demonstrate that Gladys sought advice from (a) a competent person; (b) who was disconnected from the 2008 will's beneficiaries; and (c) who was wholly devoted to Gladys's own interest. *See In re Estate of Hart*, 20 So. 3d 748, 756 (¶22) (Miss. Ct. App. 2009).

¶44. No dispute exists that White was competent to legally advise Gladys on the 2008 will. However, White testified that he did not advise Gladys about the substance of her will

19

because she had already decided what she wanted. He simply prepared a will to reflect her stated wishes.[7] "The jury is the final arbiter of a witness's credibility" and "weighs the weight and worth of any conflicting testimony." *Williams v. State*, 794 So. 2d 1019, 1028 (¶59) (Miss. 2001). After assessing the evidence, the jury could have found the Proponents failed to prove by clear and convincing evidence that Gladys exhibited independent consent and action.

¶45. Viewing the evidence in the light most favorable to the Contestants, we conclude a reasonable juror could have found the Contestants met their evidentiary burden to establish the second prong for undue influence. We further find sufficient evidence existed for a jury to determine the Proponents failed to rebut the presumption of undue influence by clear and convincing evidence. Because substantial evidence supports the jury's verdict, we refuse to reverse the chancellor's denial of the Proponents' motion for a JNOV. *See Cope*, 231 So. 3d at 993 (¶5). We therefore find this assignment of error lacks merit.

## CONCLUSION

¶46. Because we find no merit to the Proponents' assignments of error, we affirm the chancellor's final judgment and his denial of their motion for a JNOV.

¶47. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**

---

[7] The Contestants' attorney clearly conveyed that the Contestants were not accusing White of any wrongdoing; rather, White just "had the pleasure and privilege" of being the attorney who drafted the disputed will.